Cody WADE by his Co-Conservators, et al.

v.

TENNESSEE DEPARTMENT OF FINANCE AND ADMINIS-TRATION, et al.

Court of Appeals of Tennessee,
AT NASHVILLE.

August 19, 2015 Session

Filed November 3, 2015

Application for Permission to Appeal Denied by Supreme Court
February 18, 2016

Herbert H. Slatery, III, Attorney General and Reporter; Andrée Blumstein, Solicitor General; and Shayna R. Abrams, Senior Counsel; for the appellants, State of Tennessee, Department of Finance and Administration, Bureau of TennCare, and Larry B. Martin, Commissioner.

Roy B. Herron, Dresden, Tennessee, and Donald Capparella, Nashville, Tennessee, for the appellees, Cody Wade and his Co–Conservators, Reba and Ronnie Wade.

## OPINION

ANDY D. BENNETT, J., delivered the opinion of the court, in which FRANK G. CLEMENT, JR., P.J., M.S., and W. NEAL McBRAYER, J., joined.

Appellant TennCare enrollee has been receiving 24/7 care from a private duty nurse in the home of his grandparents in Martin, Tennessee. TennCare determined that he could receive adequate care for less cost in a special respiratory care unit in St. Francis Hospital in Memphis. Enrollee, through his grandparents as his co-conservators, filed an administrative appeal. The administrative law judge agreed with TennCare. Appellants appealed that decision to chancery court, which reversed the administrative law judge's decision as being arbitrary and capricious. TennCare appealed. We reverse the decision of the chancery court and affirm the administrative law judge's opinion.

Cody Wade is a twenty-six-year-old TennCare enrollee who is diagnosed with traumatic and anoxic brain injury, quadriplegia, blindness and other conditions. He is dependent on a ventilator, bed or wheelchair bound, nonverbal, and fed and medicated through a tube. He receives care twenty-four hours a day, seven days a week ("24/7") from a private duty nurse ("PDN") at his grandparents' home in Martin, Tennessee. His grandparents, Ronnie and Reba Wade, are his co-conservators.

In 2013, TennCare notified Cody that the 24/7 PDN service was not medically necessary for him because it was not the "least costly care" that would meet his needs. TennCare sought to transfer him to Signature Healthcare, a respiratory care unit within St. Francis Hospital in Memphis, Tennessee. The facility is approximately a 250-mile round trip drive from his grandparents' home. In the alternative, TennCare offered sixteen hours of in-home PDN services a day, seven days a week, which is the cost equivalent of Signature Healthcare. Cody, through his co-conservator grandparents, filed an administrative appeal with the Department of Finance and Administration seeking to continue 24/7 PDN service for Cody in their home.

An administrative hearing was held on November 21, 2013. The next month, the administrative law judge ("ALJ") held that "[t]he Petitioner failed to prove that a nursing home with a dedicated respiratory care unit is incapable of providing all of the services included in Petitioner's treatment plan." He emphasized that TennCare was only required to provide services that are adequate to treat the medical condition and are the least costly. The PDN service averaged $26,640 a month, while the facility's cost was approximately $18,000 a month. The initial order of the ALJ eventually became the final administrative order.

The Petitioners filed an "Emergency Motion to Stay Order of Administrative Agency Action Pending Judicial Review" that was granted by the chancery court. TennCare filed a motion to dismiss that the chancery court denied on June 13, 2014, holding that the Petitioners' emergency motion constituted a petition for judicial review. Relying on the testimony of the treating physician and a psychologist, the court determined that the treatment at the skilled respiratory care facility would not be "adequate" to treat Cody's medical condition. The court held that "there is substantial and material evidence in the record to support the testimony of Petitioners' treating medical professionals that the treatment [Cody] would receive in a skilled respiratory facility is not adequate to meet his medical needs." The chancery court reversed the administrative order. TennCare appealed.

## STANDARD OF REVIEW

Tennessee Code Annotated section 4-5-322(h) governs the judicial review of decisions made by administrative agencies. *Publix Super Mkts., Inc. v. Tenn. Dep't of Labor & Workforce Dev., Labor Standards Div.*, 402 S.W.3d 218, 222 (Tenn. Ct. App. 2012).

> The court may affirm the decision of the agency or remand the case for further proceedings. The court may reverse or modify the decision if the rights of the petitioner have been prejudiced because the administrative findings, inferences, conclusions or decisions are:
>
> (1) In violation of constitutional or statutory provisions;
>
> (2) In excess of the statutory authority of the agency;
>
> (3) Made upon unlawful procedure;
>
> (4) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion; or
>
> (5) (A) Unsupported by evidence that is both substantial and material in the light of the entire record.

Tenn.Code Ann. § 4-5-322(h). When reviewing a trial court's examination of an administrative agency's decision, the appellate court must determine " 'whether or not the trial court properly applied the ... standard of review' found at Tennessee Code Annotated § 4-5-322(h)." *Jones v.*

*Bureau of TennCare,* 94 S.W.3d 495, 501 (Tenn. Ct. App. 2002) (quoting *Papachristou v. Univ. of Tenn.,* 29 S.W.3d 487, 490 (Tenn. Ct. App. 2000)).

■ In a case such as this, when clinical judgments are at issue, a special definition of "substantial and material evidence" applies. That definition is explained in a *Grier v. Goetz,* No. 79–3107, at 22–25 (M.D.Tenn. Feb. 5, 2008)[1] consent decree:

7. **Decisions to be supported by substantial and material evidence.** In any appeal of an adverse action affecting TennCare benefits, throughout all stages of such appeal, the defendants[2] shall ensure that decisions must be based upon substantial and material evidence. In cases involving clinical judgments, this requirement specifically means that:

a. Appeal decisions must be supported by medical evidence, and it is the defendants' responsibility to elicit from beneficiaries and their treating providers[3] all pertinent medical records that support an appeal; and

b. Medical opinions shall be evaluated as follows:

(i) Where the treating provider's opinion is *consistent* with the defendants' or MCC's[4] opinion or objective evidence, it shall be accorded *controlling* weight.

(ii) Where the treating provider's opinion is:

(A) *well-supported* with clinical and laboratory findings derived from an examination of the enrollee or enrollee's medical records, *and* objective evidence; or

(B) *well-supported* with clinical and laboratory findings derived from an examination of the enrollee or the enrollee's medical records, *but not* with objective evidence,

the opinion shall be accorded controlling weight, *even if it is inconsistent* with the defendants' or MCC's opinion or objective evidence; provided, *however,* that the treating provider's opinion does not significantly deviate from the defendants' or MCC's opinion or objective evidence. If the treating provider's opinion significantly deviates from the defendants' or MCC's opinion or objective evidence, the defendants or MCCs may require the treating provider to further explain his or her opinion.

(iii) Where the treating provider's opinion is:

(A) *not well-supported* with clinical and laboratory findings derived from an examination of the enrollee or the enrollee's medical records, *but is well-supported by* objective evidence; or

(B) *not well-supported* with *either* clinical and laboratory findings derived from an examination of the

---

1. *Grier v. Goetz* is a class action suit filed on behalf of current and future Tennessee Medicaid recipients. *Davidson v. Bredesen,* 330 S.W.3d 876, 885 (Tenn. Ct. App. 2009) (citing *Grier v. Goetz,* 402 F.Supp.2d 876 (M.D. Tenn. 2005)). It has "resulted in a series of consent decrees entered into by the State of Tennessee." *Id.*

2. The *Grier* consent decree defines "defendants" as meaning "the named state defendants." *Grier* Consent Decree at 2.

3. "The term 'provider' means a health care provider eligible by professional qualifications to participate in TennCare, and who is acting within her scope of practice." *Grier* Consent Decree at 5.

4. "MCC" is a managed care contractor. *Grier* Consent Decree at 2.

enrollee or the enrollees' medical records, or objective evidence,

the opinion shall be accorded *minimal* weight if it is *inconsistent* with the defendants' or MCC's opinion or objective evidence. The defendants or MCCs may require the treating provider to further explain his or her opinion.

(iv) In the event the defendants or MCCs require further explanation from the treating provider as described in Paragraph C(7)(b)(ii) and (iii),

(A) the treating provider's opinion shall be accorded *controlling* weight, if the treating provider *submits* an explanation or other clinical or objective evidence *and* the defendants or MCCs deem such additional information to be sufficient to cure the original deficiency.

(B) the treating provider's opinion shall be accorded *minimal* weight, if the treating provider *fails to submit* an explanation or other clinical or objective evidence, or the defendants or MCCs deem any additional information submitted by the treating provider to be insufficient to cure the original deficiency.

(v) Objective evidence may include the standard treatment for specific medical conditions or the use of specific health technologies, including evidence-based treatment guidelines and technology assessments, and the results of well-supported clinical trials and studies, recommendations from other health care providers, clinical guidelines, standards or recommendations from respected medical organizations or governmental health agencies, analyses from independent health technology assessment organizations, and policies of other health plans. In considering whether the treating provider's opinion is well-supported by objective evidence, as described in Paragraph C(7)(b)(ii)-(iii), or whether any objective evidence submitted to cure the original deficiency is sufficient, as described in Paragraph C(7)(b)(iv), the defendants or MCCs shall consider the validity and reliability of the objective evidence (including any objective evidence upon which the defendants or MCCs rely) in accordance with the medical necessity rules enacted by the defendants.

(vi) Opinions from treating providers are valued because they are the medical professionals most able to provide a detailed, longitudinal picture of the enrollee's medical condition(s) and may bring a unique perspective to the medical evidence that cannot be obtained from objective evidence alone, or from reports of individual examinations, such as consultative examinations or brief hospitalizations.

(vii) The notice of adverse action shall include a statement of reasons for the weight given to the treating provider, including, but not limited to, the supportability of the opinion with clinical and laboratory findings and objective evidence, and the consistency of the opinion with the medical record as a whole, including any objective evidence upon which the defendants or MCCs rely. If the defendants or MCCs invoke objective evidence as the basis for the adverse action, they shall describe with specificity the objective evidence supporting their judgment and how it applies to the unique medical condition of the individual beneficiary.

(emphasis in original).

## ANALYSIS

Tennessee's Medicaid program is known as TennCare. *Rosen v. Goetz,* 129 Fed.

Appx. 167, 169 (6th Cir. 2005). It was established in 1993 via a federal waiver which suspended "certain federal statutory and regulatory provisions." *John B. v. Menke*, 176 F.Supp.2d 786, 788 (M.D.Tenn. 2001); *see also* James F. Blumstein & Frank A. Sloan, *Health Care Reform Through Medicaid Managed Care: Tennessee (TennCare) as a Case Study and a Paradigm*, 53 VAND. L. REV. 125, 129 (2000). TennCare's waiver application explicitly stated the premise of the program: "There are sufficient resources now in the overall public-supported health care system to provide an acceptable level of quality care both to the needy who have been traditional clients of public programs and those who are not covered by health insurance through their employment or otherwise." Blumstein & Sloan, 53 VAND. L. REV. at 168 n.165 (citing 1 TennCare: A New Direction in Health Care 11 (1993) (Tennessee's TennCare waiver application)). Thus, Tennessee's TennCare program began with the premise that the Medicaid funding level was sufficient. The goal was to increase access within existing resources and to maximize federal funding. *Id.* at 168.

Right off the bat, the Attorney General invokes the goal of increasing access within existing resources. The first sentence of the State's statement of facts says that TennCare's goal is "the principled distribution of limited resources to provide medical services to the largest possible population." Of course, TennCare seeks to accomplish this goal in a myriad of ways not relevant to the instant situation. The pertinent statute for this case is Tenn.Code Ann. § 71–5–144:

(a) Enrollees under the TennCare program are eligible to receive, and TennCare shall provide payment for, only those medical items and services that are:

. . .

(2) Determined by the TennCare program to be medically necessary.

(b) To be determined to be medically necessary, a medical item or service must be recommended by a physician who is treating the enrollee or other licensed healthcare provider practicing within the scope of the physician's license who is treating the enrollee and must satisfy each of the following criteria:

(1) It must be required in order to diagnose or treat an enrollee's medical condition. The convenience of an enrollee, the enrollee's family, or a provider, shall not be a factor or justification in determining that a medical item or service is medically necessary;

(2) It must be safe and effective. To qualify as safe and effective, the type and level of medical item or service must be consistent with the symptoms or diagnosis and treatment of the particular medical condition, and the reasonably anticipated medical benefits of the item or service must outweigh the reasonably anticipated medical risks based on the enrollee's condition and scientifically supported evidence;

(3) It must be the least costly alternative course of diagnosis or treatment that is adequate for the medical condition of the enrollee. When applied to medical items or services delivered in an inpatient setting, it further means that the medical item or service cannot be safely provided for the same or lesser cost to the person in an outpatient setting. Where there are less costly alternative courses of diagnosis or treatment, including less costly alternative settings, that are adequate for the medical condition of the enrollee, more costly alternative courses of diagnosis or treatment are not medi-

cally necessary. An alternative course of diagnosis or treatment may include observation, lifestyle or behavioral changes or, where appropriate, no treatment at all; and

(4) It must not be experimental or investigational....

In the context of medical necessity, TennCare's regulations define the term "adequate" to mean:

that the item or service, considered as part of a course of diagnosis or treatment, is sufficient, but not in excess of what is needed, for diagnosis or treatment of the particular medical condition. In order for a medical item or service to be determined adequate, such item or service must also satisfy the requirements at rule 1200–13–16–.05(5) regarding "safe and effective" and the requirements at rule 1200–13–16–.05(6) regarding "not experimental or investigational."

TENN. COMP. R. & REGS. 1200–13–16–.01(1).

In a case like this, it is very easy for a court to jump deeply into the facts and try to figure out what the proof indicates is best for Cody. But, we must be mindful of our role in an appeal under the Uniform Administrative Procedures Act ("UAPA"). Our job, as framed by the statute governing UAPA appeals and the issues raised by the parties, is to determine whether the decision of the ALJ is arbitrary and capricious and whether substantial and material evidence supports the ALJ's decision. Tenn.Code Ann. § 4–5–322(h).

After examining the law "and evidence, the trial court stated:

this Court finds that there is substantial and material evidence in the record to support the testimony of Petitioners' treating medical professionals that the treatment Mr. Wade would receive in a skilled respiratory facility is not adequate to meet his medical needs. In

order for a service to be medically necessary, it must be the least costly alternative that is adequate to treat the enrollee's condition. A skilled respiratory facility does not satisfy the adequacy requirement, as the substantial and material evidence in the record shows that Mr. Wade needs constant, hands-on, one-on-one 24/7 medical care. While the Court is sensitive to the fact that the cost to TennCare of 24/7 private duty nursing is quite high, it is the only care this Court finds adequate to treat Mr. Wade's medical needs. Mr. Wade requires one-on-one attention that can only be adequately given by a private duty nurse.

The trial court's decision is summarized in the conclusion of its opinion: "the Court finds that Respondents' [TennCare's] decision in the final administrative order is arbitrary and capricious because it reflects a clear error in judgment. TennCare exceeded its statutory authority when it directed medical treatment that was not adequate for Petitioner."

The substantial and material evidence standard is to be applied to the decision of the administrative agency, not the argument of the party appealing. As noted earlier, "The trial court may reverse or modify the decision [of the agency] if the rights of the petitioner have been prejudiced because *the administrative findings, inferences, conclusions or decisions* are ... [u]nsupported by evidence that is both substantial and material in the light of the entire record." Tenn.Code Ann. § 4–5–322(h)(5)(A) (emphasis added). Thus, the trial court erred when it applied the substantial and material standard to the petitioners' proof. This error infects the court's entire conclusion because it leads to the decision that the skilled respiratory facility is not adequate to meet Cody's medical needs. Logically, requir-

ing Cody to reside in a facility that does not provide for his needs is an error in judgment and, therefore, arbitrary and capricious. *See Jackson Mobilphone Co., Inc. v. Tenn. Pub. Serv. Comm'n,* 876 S.W.2d 106, 110–11 (Tenn. Ct. App. 1993) ("In its broadest sense, the [arbitrary and capricious] standard requires the court to determine whether the administrative agency has made a clear error in judgment.").

In order to apply the substantial and material evidence standard, we must first decide on the effect of the testimony of the treating providers based on the criteria outlined in *Grier.* Under the terms of the consent decree, " 'provider' means a health care provider eligible by professional qualifications to participate in TennCare, and who is acting within her scope of practice." *Grier* Consent Decree at 5. Dr. Robert Kennon, a psychologist, never treated Cody. He testified that he only evaluated Cody. Consequently, Dr. Kennon was not a "treating provider," and his opinions are not entitled to heightened consideration under the *Grier* standards. Similarly, Dr. Dana Nash is the Medical Director of Dove Health in Collierville, which includes a respiratory unit. She testified that her knowledge of Cody's condition came from conversations with Cody's attorney and a representative of Blue Care. She never examined Cody or reviewed his medical records. She, too, is not a "treating provider," and her opinions are not entitled to heightened consideration under the *Grier* standards.

■ April Laster and Freda Pond are both licensed practical nurses ("LPNs") who take care of Cody. Treating providers are not required to be physicians. *See Grier* Consent Decree at 5. In fact, the *Grier* Consent Decree contains a definition of "treating physician." "The term 'treating physician' [or clinician] refers to a health care provider who has provided diagnostic or treatment services for a beneficiary ... for purposes of treating, or supporting the treatment of, a known or suspected medical condition." *Grier* Consent Decree at 6. The definition of "treating physician" suggests that it is a more restrictive term than "treating provider." TennCare, however, proposes that neither LPN can testify that Cody needs 24/7 PDN care because medically necessary services must be recommended by a professional acting within the scope of his or her license and LPNs cannot prescribe this sort of care. *See* TENN. COMP. R. & REGS. 1200–13–16–.05(1)(a). While this may be true, the LPNs can testify as to their duties, their experiences with Cody, and their observations of his condition.

April Laster testified to a daily routine with Cody that requires almost constant interaction and observation. "Cody's regimen needs and ordered treatments requires you 24 hours a day." She said that they monitor Cody continuously for signs of aspiration. "He has gastric reflux and will spit up or vomit at any time without any warning. You must suction his mouth immediate[ly] to prevent him from aspiration and position him to his left side to protect his airway." Ms. Laster also indicated that the monitors do not always alert her that Cody is vomiting. "But, I mean, if I'd not been in the room with him, you know, there was no way I would have known he was vomiting, because there's no machine that's going to go off and let you know that he's throwing up." She further testified:

> Due to the immediate intervention that we've provided Cody when he starts vomiting or choking on his own saliva, we can decrease his risk of aspirating and protect his airway, but you have to be right there. You can't be down the hall. You have to be there.... You

know, your O2 stats machine might go off once he's turned blue, but, I mean, that could be a little too late.

Ms. Laster later indicated that Cody has one of the alarms that the proposed facility uses and "those alarms do not always go off when he vomits. It may once the airway is obstructed."

Freda Pond testified similarly, stating Cody could "be fine, nothing wrong with him, then the next thing you know, he's regurgitating ... So, like, April said, we have to reposition him very quickly, suction his mouth out to keep that [aspiration] from happening."

The LPNs' testimony is enlightening as to Cody's fragile condition. Their testimony does not, however, qualify for heightened consideration under the *Grier* standards. Such consideration deals with medical opinions, not fact statements. *See Grier* Consent Decree at 22 ("Medical opinions shall be evaluated as follows....").

■ Dr. Clendenin is without doubt a treatment provider under the *Grier* Consent Decree. He has provided his medical opinion that Cody requires 24/7 "round-the-clock, one-on-one nursing care." In his Declaration, which provides Cody's diagnoses, he summarizes Cody's care regimen and lists his medical equipment. Two paragraphs state Dr. Clendenin's medical opinion:

5. If Cody Wade's care regimen is not complied with or his needs are not met his condition can change rapidly and at any given time. Without a nurse with him around the clock, the probability of a critical situation arising is very high. Due to the care that this patient needs, it is critical that he have 24–hour individual nursing care.

. . .

13. Cody Wade is a total care patient, requiring total constant 24–hour individual daily care. Cody is currently getting this in his home environment with 24–hour nursing and additional assistance from his family. I do not believe Cody could receive adequate care at a long-term facility at this time. Even in a hospital situation, they would not be able to provide the individual constant 24–hour care that he requires. Although cheaper, I do believe this would shorten Cody's life and cause him to suffer.

Dr. Clendenin's deposition elaborates a bit upon his conclusion:

Q. You said earlier that in your professional medical opinion he's required to have one-on-one nursing care 24 hours a day, 7 days a week. Would you elaborate on why that's necessary?

A. Due to Cody's medical conditions, he's a—a total-care patient, requiring constant, 24–hour–a–day, 7–day–a–week medical care on a one-on-one basis because of his apneic episodes and seizures and the ventilator management and other issues that he has.

He needs one-on-one monitoring and care from a nursing standpoint.

Q. In a range from fragile to sturdy, where does Cody fall on that range among patients?

A. He's—he's very fragile.

Q. If—if Cody were put in an institution, if he were put in a nursing home, what—what would that do to him?

A. He—he would lose that one-on-one total nursing care and with—due to his fragile state, I'm afraid it would shorten his lifespan.

Q. As his primary caregiver and as someone who's treated him for the past six years, would you recommend that he be placed in a long-term care facility?

A. No.

Q. Would you recommend that he not be?

A. Yes.

To determine whether Dr. Clendenin's medical opinion is to be given controlling weight, it must be tested against the criteria in the *Grier* Consent Decree. We must examine the doctor's clinical and laboratory findings and any objective evidence he uses to support his medical opinion. The *Grier* Consent Decree defines "objective evidence" only by what it may include:

(v) Objective evidence may include the standard treatment for specific medical conditions or the use of specific health technologies, including evidence-based treatment guidelines and technology assessments, and the results of well-supported clinical trials and studies, recommendations from other health care providers, clinical guidelines, standards or recommendations from respected medical organizations or governmental health agencies, analyses from independent health technology assessment organizations, and policies of other health plans. In considering whether the treating provider's opinion is well-supported by objective evidence, as described in Paragraph C(7)(b)(ii)-(iii), or whether any objective evidence submitted to cure the original deficiency is sufficient, as described in Paragraph C(7)(b)(iv), the defendants or MCCs shall consider the validity and reliability of the objective evidence (including any objective evidence upon which the defendants or MCCs rely) in accordance with the medical necessity rules enacted by the defendants.

*Grier* Consent Decree at 24.

In this instance, the term "objective evidence" addresses the source of the evidence rather than its quality. "Objective" refers to being externally verifiable rather than the product of an individual's perception. BLACK'S LAW DICTIONARY 1103 (8th ed.2004). It can also refer to evidence that can be supplied by disinterested sources. *Id.*; *In re Apex Auto. Warehouse, L.P.,* 238 B.R. 758, 769 (Bankr.N.D. Ill. 1999) ("objective evidence is that which can be supplied by disinterested third parties"). In accordance with the last sentence of the above paragraph, TennCare has established a hierarchy of objective evidence:

HIERARCHY OF EVIDENCE shall mean a ranking of the weight given to medical evidence depending on objective indicators of its validity and reliability including the nature and source of the medical evidence, the empirical characteristics of the studies or trials upon which the medical evidence is based, and the consistency of the outcome with comparable studies. The hierarchy in descending order, with Type I given the greatest weight is:

(a) Type I: Meta-analysis done with multiple, well-designed controlled clinical trials;

(b) Type II: One or more well-designed experimental studies;

(c) Type III: Well-designed, quasi-experimental studies;

(c) Type IV: Well-designed, non-experimental studies; and

(d) Type V: Other medical evidence defined as evidence-based

1. Clinical guidelines, standards or recommendations from respected medical organizations or governmental health agencies;

2. Analyses from independent health technology assessment organizations; or

3. Policies of other health plans.

TENN. COMP. R. & REGS. 1200–13–16–.01(21).

In the instant case, we need not dive into an analysis of the objective evidence

supporting Dr. Clendenin's medical opinion because he did not provide any.

Without support from objective evidence, Dr. Clendenin's medical opinion that Cody requires "24–hour individual nursing care" will only be given controlling weight if it is " *well-supported* with clinical and laboratory findings derived from an examination of the enrollee or enrollee's medical records, ... *provided, however,* that the treating provider's opinion does not significantly deviate from the defendants' or MCC's opinion or objective evidence." *Grier* Consent Decree at 22–23 (emphasis in original). While everyone agrees on Cody's diagnosis and the treatment plan, there is significant disagreement over how and where that treatment should occur. Dr. Clendenin maintains that Cody needs "24–hour individual nursing care" at home. His opinion differs from that of TennCare, which wants to place Cody in a special respiratory care unit. Even if Dr. Clendenin's opinion is " *well-supported* with clinical and laboratory findings derived from an examination of the enrollee or enrollee's medical records," this significant difference of opinion prevents Dr. Clendenin's opinion from being given controlling weight by the *Grier* Consent Decree. *Grier* Consent Decree at 23.

▮▮▮ Now that we have determined that Dr. Clendenin's medical opinion is not given controlling weight under the *Grier* Consent Decree, we proceed with an examination of whether the administrative decision is supported by substantial and material evidence. Substantial and material evidence is " 'such relevant evidence as a rational mind might accept to support a rational conclusion' " and to furnish a " 'reasonably sound factual basis for the decision being reviewed.' " *City of Memphis v. Civil Serv. Comm'n of City of Memphis,* 216 S.W.3d 311, 316–17 (Tenn. 2007) (quoting *Jackson Mobilphone Co.,*

876 S.W.2d at 110–11). "Resolving conflicting evidence is for the agency." *Wayne Cnty. v. Tenn. Solid Waste Disposal Control Bd.,* 756 S.W.2d 274, 281 (Tenn. Ct. App. 1988). The reviewing court may not substitute its judgment concerning the weight of the evidence for that of the agency as to questions of fact. *Jones,* 94 S.W.3d at 501. "We may not reverse an administrative decision supported by substantial and material evidence solely because the evidence could also support another result." *Martin v. Sizemore,* 78 S.W.3d 249, 276 (Tenn. Ct. App. 2001). Rather, we may reverse an administrative determination only if a reasonable person would necessarily arrive at a different conclusion based on the evidence. *Id.*

The administrative hearing produced a large amount of evidence in a relatively short time. Fortunately, most of it is not disputed. There is no dispute on Cody's diagnosis. The only dispute is over how and where his treatment should occur. TennCare's witness, Dr. David Thombs, testified that he had reviewed Cody's medical records. He indicated that Cody could be placed in a special respiratory care unit. He stated that he had visited the facility, spending about an hour on the unit. Dr. Thombs described it as "a specialized unit for the treatment of patients who need ventilator care, have a tracheostomy or then need to have some improvement in their pulmonary function so that they don't have the need of ventilator care." He noted that "there are two sets of alarms that a patient would trigger should they have difficulty." Dr. Thombs reviewed Cody's medical records and testified as to Cody's condition. In particular, he discussed two hospitalizations, episodes of sudden heart rate increases, the discovery that Cody had "a form of hydrocephalus," and seizure activity. Dr. Thombs testified "that for the diagnosis or treatment of the

medical conditions that [Cody] has[,] these conditions can be sufficiently and adequately treated at the unit at St. Francis." He further indicated that Cody's "seizure activity could be better identified or ruled out with the type of proximity of the types of medical care that are on that unit."

When questioned about the facility's proximity to Cody's family, Dr. Thombs testified that "[e]very effort is made to find a unit that is as close to the family as possible, but in terms of defining medical necessity, it is not taken into consideration." It was further brought out that Dr. Thombs had never "disagreed with BlueCare regarding the issue of less expensive facility versus private duty nursing 24/7." He had never seen or examined Cody Wade. Dr. Thombs expressly disagreed with Dr. Nash's and Dr. Kennon's opinions that Cody could not be adequately cared for if he was away from his family.

TennCare's other witness was Yolandra Trezevant, who was the unit manager of the ventilator unit at Signature Healthcare in Memphis. She testified that it was a separate unit on the fourth floor of St. Francis Hospital and that it served patients with the type of needs Cody had. Approximately ten staff members who could take care of Cody were there at all times, including nurses and respiratory therapists. A pulmonologist was on call at all times. The unit has vent alarms that can be heard "throughout the hallway" if there is a pressure problem with the ventilator. There is also an alarm system that monitors heart rate and oxygen saturation. The unit is 30 seconds away from the emergency room. Family can visit any time. Ms. Trezevant also stated that she had never met Cody.

Cody's main medical witness was Dr. Clendenin, who was his treating physician. In his brief deposition, Dr. Clendenin testified that, "Due to Cody's medical condi-tions, he's a—a total-care patient, requiring constant, 24–hour–a–day, 7–day–a–week medical care on a one-on-one basis because of his apneic episodes and seizures and the ventilator management and other issues that he has. He needs one-on-one monitoring and care from a nursing standpoint." We have already concluded, however, that under the *Grier* Consent Decree Dr. Clendenin's medical opinion receives "minimal weight." *Grier* Consent Decree at 23.

Two of Cody's nurses, April Laster and Freda Pond, testified as to Cody's condition and their activities. Both felt that it was vitally important for someone to be actually with and watching Cody at all times because he would vomit without warning, requiring action on their parts, and the alarms did not always go off.

Cody's grandfather, Ronnie Wade, testified that he assisted the nurses sometimes. He stated that he could calm Cody down when his heart rate got too high.

Dr. Kennon testified that taking Cody away from his home "would potentially erode Cody's quality of life." He said it could be traumatic for Cody and "psychologically imprisoning." He further stated that Cody's coping skills were "questionable." In his professional opinion, placing Cody in the facility was not adequate. Dr. Kennon had never treated Cody or performed any psychological tests on him.

Dr. Nash testified about the importance of family in a patient's care. She said that care that deprived him of contact with his family would not be adequate for Cody. She said that her knowledge of Cody's condition came from conversations with Cody's attorney and a representative of BlueCare. She never examined Cody or reviewed his medical records.

As stated earlier, this court cannot reverse an administrative decision that is

supported by substantial and material evidence solely because the evidence could also support another result. *Sizemore*, 78 S.W.3d at 276. Based on the testimony of Dr. Thombs and Yolanda Trezevant, we find that there is substantial and material evidence to support the administrative decision.

The trial court found that the administrative decision was arbitrary and capricious because it reflected a clear error in judgment. "In its broadest sense, the [arbitrary and capricious] standard requires the court to determine whether the administrative agency has made a clear error in judgment." *Jackson Mobilphone*, 876 S.W.2d at 110–111. "An arbitrary decision is one that is not based on any course of reasoning or exercise of judgment or one that disregards the facts or circumstances of the case without some basis that would lead a reasonable person to reach the same conclusion." *Id.* at 111 (citations omitted).

We do not find that the administrative decision is arbitrary and capricious. The TennCare enrollee, Cody, bears the burden of proof. TENN. COMP. R. & REGS. 1200–13–16.08. The administrative law judge found Cody did not prove that 24/7 PDN service was medically necessary. Phrased another way, Cody failed to prove that the ventilator unit was not adequate to meet his needs. The administrative law judge noted that none of Cody's treatment providers had any first-hand knowledge of the facility to which TennCare proposed Cody be transferred. Both Dr. Thombs and Ms. Trezevant testified that the respiratory care unit was designed to serve patients who require ventilators, like Cody. The unit is located in a hospital and is 30 seconds from the emergency room. Each patient room has all the equipment necessary for treatment and redundant monitoring systems that alert staff to any problems.

Cody makes a strong argument that the administrative law judge did not consider the effect of removing him from his home and his grandparents. The testimony of Dr. Nash and Dr. Kennon supports this contention, but only hypothetically. Neither doctor ever treated or tested Cody. There is testimony that his grandfather can calm Cody down as evidenced by a lowering of Cody's heart rate. While undoubtedly beneficial, this testimony does nothing to prove that the unit in question cannot adequately care for Cody. As previously noted, Dr. Clendenin's testimony receives only minimal weight.

We are not unmindful of Cody's plight. We understand why his family believes he should stay where he is and receive 24/7 PDN care. It has been successful so far. But TennCare is a program of limited funds. The State's expressed goal is to stretch those funds as far as they can go to help as many people as possible. The law requires that a person receive adequate medical treatment at the lowest cost. The administrative law judge determined that the respiratory care unit could provide Cody with adequate care at a lower cost than the care he is receiving now. It has not been proved that the administrative law judge made a clear error in judgment. The decision is not arbitrary and capricious.

The trial court decision is reversed. Costs of appeal are assessed against the Bureau of TennCare.