IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
September 2, 2020 Session

## METROPOLITAN GOVERNMENT OF NASHVILLE AND DAVIDSON COUNTY, TENNESSEE v. CIVIL SERVICE COMMISSION OF THE METROPOLITAN GOVERNMENT OF NASHVILLE AND DAVIDSON COUNTY, TENNESSEE ET AL.

**Appeal from the Chancery Court for Davidson County**
**No. 18-987-II          Anne C. Martin, Chancellor**

————————————————————

**No. M2019-01587-COA-R3-CV**

————————————————————

In this judicial review of an administrative decision, the trial court reversed the civil service commission's decision to reinstate a police officer to his position upon finding that the commission's reversal of the police department's termination of the employee was arbitrary and capricious. The employee has appealed. Having determined that the findings of the civil service commission were supported by substantial and material evidence but that its ultimate decision was arbitrary and capricious, we affirm the judgment of the trial court reversing the commission's decision.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed; Case Remanded**

THOMAS R. FRIERSON, II, J., delivered the opinion of the court, in which JOHN W. MCCLARTY and KRISTI M. DAVIS, JJ., joined.

Kim C. Gilleland and Lisa G. Woolley, Murfreesboro, Tennessee, and Jack Byrd, Nashville, Tennessee, for the appellant, David Terrazas.

Robert E. Cooper, Jr., and Allison L. Bussell, Nashville, Tennessee, for the appellee, Metropolitan Government of Nashville and Davidson County.

**OPINION**

I.  Factual and Procedural History

The respondent, David Terrazas, had been employed as a police officer with the Metropolitan Nashville Police Department ("MNPD") for approximately eight years prior

to his termination from that position. When his ex-girlfriend made various allegations against him to his supervisor in June 2016, the MNPD Office of Professional Accountability investigated. As a result of the investigation, Officer Terrazas submitted to a drug test and tested positive for two illegal steroids, Boldenone and Boldione.[1] The MNPD filed disciplinary charges against Officer Terrazas, alleging that he had violated MNPD rules and regulations, specifically section 2.10.100 of the MNPD Substance Abuse Program ("MNPD Policy"), as well as similar provisions of the Civil Service Rules of the Metropolitan Government of Nashville and Davidson County ("Metro"). We note that the applicable MNPD Policy regulations are included in the administrative record presented to the Davidson County Chancery Court ("trial court") and to this Court on appeal.

Throughout the proceedings, Officer Terrazas has maintained that he did not ingest the two steroids for which he tested positive but that Equibolin, an over-the-counter supplement he had taken in an effort to regain strength after sustaining a significant injury while on duty, caused the positive test result. Officer Terrazas testified during the administrative hearing that he had taken the supplement for the purpose of gaining muscle mass and strength after his injury on the advice of trainers at the gym where he exercised and from employees at a supplement shop.

The MNPD chief's designee conducted a disciplinary hearing on January 31, 2017, during which Officer Terrazas appeared and was represented by counsel. The chief's designee determined that Officer Terrazas should be terminated from his employment due to the positive drug test, which constituted a Category AA offense meriting dismissal.[2] Officer Terrazas was notified of that decision via a disciplinary action letter.

Upon Officer Terrazas's timely appeal to the Metropolitan Government Civil Service Commission ("the Commission"), administrative law judge Steve Darnell ("the ALJ") conducted an administrative evidentiary hearing on February 1, 2018. In an initial order entered on May 2, 2018, the ALJ reversed Officer Terrazas's employment termination and instead suspended him for twenty days. The ALJ concluded that "MNPD mistakenly relied on § 2.10.100 of its Substance Abuse Program in terminating

---

[1] Per MNPD Substance Abuse Program § 2.10.080, this positive test result would have been reviewed and interpreted by a physician (the Medical Review Officer) who then would have contacted the employee to determine whether an alternative medical explanation for the substances found in the urine specimen could be provided. According to the policy, if the Medical Review Officer had determined that a legitimate medical explanation for the substances in question existed, the test result would have been reported as a negative.

[2] Officer Terrazas was also charged with using MNPD electronic records to make queries concerning his wife and his girlfriend without a business purpose. He received a four-day suspension for that violation, which he has not challenged on appeal.

[Officer Terrazas]" because "MNPD perceived [Officer Terrazas's] drug screen as a violation of this policy and imposed a 1st offense/category AA disciplinary action requiring termination." The ALJ found, however, that Equibolin was "not a controlled substance or **immediate precursor** to a controlled substance" (emphasis in original). The ALJ determined that section 2.10.040 of the MNPD Policy, which addresses performance-enhancing substances, applied instead and merited the twenty-day suspension.

Metro appealed the initial order. Upon review and a hearing, the Commission affirmed the twenty-day suspension while amending some of the key factual findings in the initial order. The amended findings contained in the final order, entered on July 18, 2018, were as follows:

- Equibolin is an immediate precursor to a controlled substance;
- Mr. Terrazas tested positive for Boldione and Boldenone;
- Mr. Terrazas violated MNPD Manual Section 2.10.100(B), Positive Test Results, with this positive drug test; and
- Mr. Terrazas should be reinstated to his position as a Police Officer II without backpay or other benefits for the time period in which he had been terminated, thereby reflecting a suspension from January 31, 2017 to July 10, 2018.

Metro sought reconsideration by the Commission, which was denied following a hearing.

Metro commenced the instant action on September 13, 2018, by filing a petition for judicial review in the trial court pursuant to Tennessee Code Annotated §§ 4-5-322 and 27-9-114(b). Metro alleged that the Commission's decision was arbitrary and that Metro was adversely affected by the Commission's ruling because it would be "required to return to work a police officer who has failed a drug test and can therefore no longer meet the standards of public trust required for his duties, including for court testimony and interactions with the public."

Officer Terrazas filed a "reply brief," arguing that his reinstatement should be permitted to stand because it was neither in excess of the Commission's authority nor arbitrary and capricious. He argued, however, that the Commission had engaged in a "faulty application of certain provisions of the Department's Substance Abuse policy" and that the "underlying modifications [of the ALJ's initial order] should be reversed and the ruling of the ALJ reinstated regarding the fact that Equibolin does not legally qualify as an immediate precursor and as such is not a violation of MNPD Manual 2.10.100(B), Positive Test Results."[3]

---

[3] Officer Terrazas also argued in his reply that the "uncompromising language of the policy that 'a positive test is a positive test, no matter the source of the substance that produces the positive test'

- 3 -

Following a hearing conducted on June 6, 2019, the trial court entered an order on August 8, 2019, finding that "the MNPD Policy is clear in this instance," "the appropriate sanction under that policy was termination of employment," and "[t]he Commission departed from that policy in reversing the MNPD's disciplinary decision." Considering the language of the disciplinary policy, the trial court concluded that "the MNPD effectively created a 'zero tolerance policy' for substance abuse in cases triggered by a positive test result." In then examining whether the Commission had the "authority to override MNPD policy and impose its own alternative sanctions," the trial court examined the Metro Charter, specifically sections 8.203, 12.01, 12.03, and 12.05, which are regulations concerning the operation of the police department and the civil service system, and concluded that "it is the Commission's responsibility to determine whether there is 'just cause' for a termination and to exercise its 'review' authority consistently with the applicable departmental rules and regulations."[4] The trial court determined that the Commission had impermissibly "substitute[d] its judgment for the lawfully established rules, regulations and policies of the MNPD," rendering its decision "arbitrary and capricious."

The trial court thereby reversed the decision of the Commission and reinstated the decision of the MNPD chief's designee to terminate Officer Terrazas's employment. Officer Terrazas timely appealed to this Court.

## II. Issue Presented

Officer Terrazas presents one issue for our review, which we have restated slightly as follows:

> Whether the trial court failed to conduct the proper three-step analysis of the Commission's findings, as required by Tennessee Code Annotated § 4-5-322, by declining to consider Officer Terrazas's argument that the Commission had reached a legally erroneous conclusion that he violated MNPD Policy § 2.10.100.

---

prohibits an employee from having any legitimate ability to advocate on his behalf to protect his career" in violation of his substantive due process rights. We note that Officer Terrazas conceded in his brief in support of his petition before the trial court that his procedural due process rights had not been violated. Although Officer Terrazas's substantive due process rights were discussed during the trial court's hearing, the trial court did not address this issue in its order, and Officer Terrazas has not raised this issue on appeal or devoted any argument to it in his appellate brief. Accordingly, we will not consider whether the MNPD Policy infringed on Officer Terrazas's substantive due process rights. *See Hodge v. Craig,* 382 S.W.3d 325, 334 (Tenn. 2012) ("Appellate review is generally limited to the issues that have been presented for review.").

[4] Metro had filed certified copies of Metro Charter provisions with the trial court in support of its petition.

## III. Standard of Review

Tennessee Code Annotated § 27-9-114(b)(1) (2017) provides that the courts review the decisions of local civil service boards affecting the employment status of local government employees using the standard of review set forth at Tennessee Code Annotated § 4-5-322(h) (Supp. 2020) of the Uniform Administrative Procedures Act. *See Smith v. White*, 538 S.W.3d 1, 10 (Tenn. Ct. App. 2017). Tennessee Code Annotated § 4-5-322 provides in pertinent part:

> (h)  The court may affirm the decision of the agency or remand the case for further proceedings. The court may reverse or modify the decision if the rights of the petitioner have been prejudiced because the administrative findings, inferences, conclusions or decisions are:
>
> > (1)  In violation of constitutional or statutory provisions;
> >
> > (2)  In excess of the statutory authority of the agency;
> >
> > (3)  Made upon unlawful procedure;
> >
> > (4)  Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion; or
> >
> > (5)(A) Unsupported by evidence that is both substantial and material in the light of the entire record.
> >
> > > (B) In determining the substantiality of evidence, the court shall take into account whatever in the record fairly detracts from its weight, but the court shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact.
>
> (i)  No agency decision pursuant to a hearing in a contested case shall be reversed, remanded or modified by the reviewing court unless for errors that affect the merits of such decision.
>
> (j)  The reviewing court shall reduce its findings of fact and conclusions of law to writing and make them parts of the record.

Although our review of an agency's factual findings is confined to the provisions of Tennessee Code Annotated § 4-5-322, we review matters of law *de novo* with no

presumption of correctness.  *See* Tenn. R. App. P. 13(d); *Davis v. Shelby Cty. Sheriff's Dep't*, 278 S.W.3d 256, 264 (Tenn. 2009).

In *Miller v. Civil Serv. Comm'n of Metro. Gov't of Nashville & Davidson Cty.*, this Court explained the applicable standard of review as follows:

> In cases where a commission's jurisdiction, authority, and procedures are not at issue, Tenn. Code Ann. § 4-5-322(h)(4), (5) require the courts to review the commission's decision using a three-step analysis. First, the court must determine whether the commission has identified the appropriate legal principles applicable to the case. Second, the court must carefully examine the commission's factual findings to determine whether they are supported by substantial and material evidence. Third, the court must examine how the commission applied the law to the facts. *Armstrong v. Metro. Nashville Hosp. Auth.,* No. M2004-01361-COA-R3-CV, 2006 WL 1547863, at *2 (Tenn. Ct. App. June 6, 2006) (No Tenn. R. App. P. 11 application filed); *McEwen v. Tenn. Dep't of Safety,* 173 S.W.3d 815, 820 (Tenn. Ct. App. 2005).

271 S.W.3d 659, 664 (Tenn. Ct. App. 2008).  Trial and appellate courts will modify a local civil service commission's decision affecting the status of an employee of local government "only if the commission's action (1) violated constitutional or statutory provisions, (2) was in excess of its authority, (3) utilized unlawful procedure, (4) was arbitrary, capricious, or characterized by an abuse or clearly unwarranted use of discretion, or (5) is unsupported by substantial and material evidence."  *Id.* (footnotes omitted).

IV.  Violation of MNPD Policy

Officer Terrazas contends that in determining that he had violated MNPD Policy, the trial court failed to conduct the proper three-step analysis of the Commission's findings.  *See* Tenn. Code Ann. § 4-5-322(h); *Miller*, 271 S.W.3d at 664.  With respect to the first step of this analysis, Officer Terrazas argues that the trial court, not the Commission, failed to "identify the appropriate legal principle to be applied to the interpretation of MNPD's Substance Abuse Policy [Program]."  We determine this argument to be unavailing because without question, the Commission (as well as the trial court) identified the appropriate program provisions that applied to Officer Terrazas's disciplinary proceeding.  At every stage of appeal, the relevant provisions of the MNPD Policy, such as section 2.10.100, which undoubtedly applies given the nature of the charge, as well as section 2.10.040, which Officer Terrazas urged should have been applied, were analyzed.  Upon a thorough review of the record, we determine that every tribunal that considered the charges and the discipline against Officer Terrazas correctly identified the appropriate legal principles in play as set forth in the MNPD Policy.

We next turn to whether the agency's factual findings are supported by substantial and material evidence. *See Miller*, 271 S.W.3d at 664. Only one factual finding is in dispute: whether Equibolin is an immediate precursor to the illegal steroids for which Officer Terrazas tested positive. Officer Terrazas urges this Court, as he did the trial court, to uphold the factual finding in the ALJ's initial order that Equibolin is not an immediate precursor to the prohibited substances of Boldione or Boldenone.[5] In the final order, the Commission amended the ALJ's factual finding to reflect that Equibolin is an immediate precursor to the prohibited steroid, an illegal controlled substance. It is the final order, not the initial order, that is the subject of our judicial review. *See McEwen v. Tenn. Dep't of Safety,* 173 S.W.3d 815, 823 (Tenn. Ct. App. 2005) (explaining that although "[a] reviewing court's task becomes somewhat more complicated when an agency disagrees with the findings of fact in an initial order," "it is still the agency's final order, not the initial order, that is reviewed").

Nonetheless, as this Court has explained:

> The initial order is a relevant and important part of the administrative record. While a reviewing court must focus its attention on the agency's final order, it may consider the initial order when determining whether the agency's final order has sufficient evidentiary support. If the record contains evidence sufficient to support the conflicting findings of the agency and the hearing officer or the administrative judge, the agency's findings must be allowed to stand even though the court might have reached a different conclusion on its own.

*Id.* at 824 (internal citations omitted). On appeal, Officer Terrazas specifically argues that the trial court and the Commission erred in concluding that he violated MNPD Policy section 2.10.100 because his consumption of Equibolin purportedly did not constitute consumption of an "immediate precursor" to a controlled substance. He argues that "[t]he metabolization of Equibolin by the human body into other naturally occurring substances does not qualify it as an immediate precursor to a controlled substance as defined by Tennessee law or MNPD policy."

The MNPD Policy, section 2.10.030(G), defines "Controlled Substances" as follows:

---

[5] Officer Terrazas also argues that determining whether this supplement constitutes an "immediate precursor" is a question of law. We disagree. Although the definition of "immediate precursor" requires reference to the MNPD Policy and its incorporation of various terms from Tennessee's Drug Control Act, *see* Tenn. Code Ann. § 39-17-402, a consideration of the relevant testimony put forth by both sides was required in order to determine whether the evidence demonstrated that Equibolin was an immediate precursor. It is thus a question of fact.

- 7 -

A drug which has been declared by federal or state law to be illegal for sale or use, but may be dispensed under a physician's prescription. A substance subject to the Controlled Substances Act (1970), which regulates the prescribing and dispensing, as well as the manufacturing, storage, sale, or distribution of substances assigned to schedules I though VII. <u>A drug, substance, or immediate precursor in Schedules I through VII of the Tennessee Code Annotated</u>.

(Emphasis added.) The MNPD Policy does not contain a definition for "immediate precursor." Upon review, we determine that although imprecise in its reference to "Schedules I through VII of the Tennessee Code Annotated," it is clear that the MNPD Policy refers to the drug schedules listed in Tennessee Code Annotated §§ 39-17-405 through -416 (2018 & Supp. 2020).

In the initial order, the ALJ noted that the term, "immediate precursor," is "taken directly from Tennessee's Drug Control Act, T.C.A. § 39-17-402" although the ALJ also stated that the definition provided in that section is not applicable to the circumstances of this case. Tennessee Code Annotated § 39-17-402(14) (Supp. 2020) defines "immediate precursor" as:

a substance that the commissioner of mental health and substance abuse services, upon the agreement of the commissioner of health, has found to be and by rule designates as being the principal compound commonly used or produced primarily for use, and that is an immediate chemical intermediary used or likely to be used in the manufacture of a controlled substance, the control of which is necessary to prevent, curtail, or limit manufacture[.]

The statute defines "manufacture" as follows in pertinent part:

the production, preparation, propagation, compounding, conversion or processing of a controlled substance, either directly or indirectly by extraction from substances of natural origin, or independently by means of chemical synthesis, and includes any packaging or repackaging of the substance or labeling or relabeling of its container . . . .

Tenn. Code Ann. § 39-17-402(15).

Concerning the definition of an immediate precursor, the Rules of the Tennessee Department of Mental Health and Substance Abuse Services, Chapter 0940-06-01, indicate that the commissioner of that department has not designated any substances as immediate precursors in the context of Schedule III controlled substances where anabolic steroids are listed. *See* Tenn. Comp. R. & Regs. 0940-06-01-.03; *see also* Tenn. Code Ann. § 39-17-410 (2018) (listing anabolic steroids as a schedule III controlled substance).

We thus agree with the ALJ's determination that the definition found in Tennessee Code Annotated Section 39-17-402(14) is not applicable to the facts in the case at bar, where the substance at issue is a supplement that converts in the body to a prohibited anabolic steroid.

Although the reference to the drug statutes does not assist us in determining whether Equibolin is an immediate precursor in this situation, the plain meaning of the words, "immediate" and "precursor," as used in section 2.10.030(G) of the MNPD Policy, does. "Precursor" is defined by MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY in relevant part as "a substance, cell, or cellular component from which another substance, cell, or cellular component is formed." 917 (10th ed. 1998). "Immediate" is defined in relevant part as "acting or being without the intervention of another object, cause, or agency: DIRECT." *Id.* at 579.

Bearing those definitions in mind, we consider the testimony regarding the substances at issue presented during the administrative hearing. Metro called Melinda Shelby, Ph.D., as a witness, and she provided testimony relevant to the determination of whether Equibolin constituted a drug, substance, or immediate precursor to the prohibited steroid for which Officer Terrazas tested positive. Dr. Shelby testified that "Boldenone is an anabolic androgenic steroid that's chemically similar to testosterone" and that "Boldione is also an anabolic androgen steroid, and it has been documented to be both a precursor and a metabolite of Boldenone." She explained what she meant by "precursor" and "metabolite" as follows:

> A precursor, sometimes also called a prohormone, would be something -- a chemical that, when you take it in your body, turns into something else.
>
> So when I say Boldione is a precursor to Boldenone, I mean that if you take Boldione, it's going to convert to Boldenone in your body.
>
> Now, as far as a metabolite goes, we all have enzymes in our body, drug metabolizing enzymes, that when the parent drug comes in, may modify the parent drug in such a way to produce a different chemical compound that we call metabolites. And often in urine drug testing, a metabolite may be present in urine for a period longer than the parent drug, and so oftentimes we will look for metabolites to indicate use of a parent drug.

Dr. Shelby testified without objection that both Boldenone and Boldione are "Schedule III controlled substances." She explained that Boldenone is a "veterinary product" and that therefore a person cannot get a prescription for it although it is "popular amongst body builders and also just different athletes that are interested in gaining muscle mass." Dr. Shelby also testified that Equibolin has a similar chemical structure

and similar biological effects as Boldenone and that "the chemical structure of the ingredient for the Equibolin, when you take it in your body, your body will convert it to Boldenone and Boldione itself." She also presented some marketing materials for Equibolin, which stated that "Equibolin is the last precursor to the prized anabolic Boldenone and uses a unique pathway to convert in the body."

The above testimony constitutes substantial and material evidence that would support a finding that Equibolin is an immediate precursor to a controlled substance. In light of Dr. Shelby's uncontroverted testimony that the chemical structure of the ingredients in Equibolin would cause the human body to convert it to Boldione, which then is converted by the body into Boldenone, sufficient evidence is in the record to support the Commission's conclusion that Equibolin is an immediate precursor to a prohibited controlled substance.

We turn to the third step in our analysis, whether the agency properly applied the law to the facts. Officer Terrazas does not dispute that he tested positive for the illegal steroids, Boldenone and Boldione. Instead, he contends that the positive test result was due to taking a legal, over-the-counter supplement and that the positive drug test cannot therefore be viewed as the result of his consuming a controlled substance or its precursor. Accordingly, he argues that his dismissal or suspension pursuant to section 2.10.100 of the policy was unwarranted.

The applicable language in the MNPD Policy provides:

2.10.100 Positive Test Results

    A.    An employee who tests positive for controlled substances or alcohol, refuses to submit to such tests, attempts to tamper with the test or is unable to provide an adequate breath or urine sample for testing is in violation of this policy, and shall be removed from performing normal duties pending further action and/or decommissioned consistent with established policy. *(Category AA)*

    B.    Whether prescription medication, over the counter medication, performance enhancing substances, or other substances, each employee is responsible for what he/she voluntarily ingests. Each employee is responsible for ensuring that the medication or other substances ingested do not impair his/her ability to perform their duties and are not prohibited by law or policy. **A positive test is a positive test, no matter the source of the substance that produces the positive test.**

(Emphasis in original.)

The ALJ relied upon a wholly different part of the MNPD Policy, section 2.10.040, to justify imposing a twenty-day suspension:

> 2.10.040 Departmental Procedures and Rules
>
>     A.    Prohibited Activity
>
>         The following rules shall apply to all applicants, probationary employees, civilian employees, and sworn employees, while on and off duty:
>
>         1.    **The illegal use of drugs is a crime which shall not be tolerated among employers of the department.** The recreational or experimental use of any illegal drug or controlled substance by an employee is prohibited. No employee shall be on duty while under the influence of intoxicants or drugs. An employee shall report for duty and remain free from the influence and odor of intoxicants and/or drugs while on duty. (*Category AA*)
>
>     * * *
>
>         5.    The non-medical use and associated abuse of prescription medications and performance enhancing drugs, as well as the use, possession, and/or distribution of illegal drugs is unacceptable and prohibited by this policy as is the use of masking agents or diuretics taken to conceal or obscure the use of prohibited drugs. (*Category B-AA*)
>
>             a.    Employees may receive a prescription drug, acquire an over-the-counter drug, dietary aid, or mood/performance enhancing substance which carries warnings that must be considered. Members should discuss these warnings with their physician along with their job tasks and duties to ensure that their performance is not affected nor the safety of the employee or others. (*Category B-AA*)

- 11 -

> b. Performance enhancing substances may also have significant warning label concerns that employees should understand. Performance enhancing drugs are any substances taken to increase a particular skill-set. These substances may not only be steroids, but include many items available over the counter and even in health food type stores. (*Category A-AA*).

(Emphasis in original.)

Officer Terrazas urges that it would have been appropriate for MNPD to charge him with violating section 2.10.040(5) of the MNPD Policy. The Commission disagreed, concluding that Officer Terrazas had violated subsection B of section 2.10.100. The Commission then imposed, in essence, a nearly eighteen-month suspension by reinstating Officer Terrazas to his position without backpay or benefits for the time period during which his employment had been terminated.

It is undisputed that Officer Terrazas tested positive for a controlled substance. Therefore, MNPD operated within the strictures of the MNPD Policy by terminating Officer Terrazas's employment. Similarly, we discern no error in the Commission's application of section 2.10.100 to the facts of this case. However, we cannot read subsection B, which does not set forth a disciplinary category for its violation, in isolation. Subsection A identifies positive test results as Category AA offenses, and those offenses carry a single disciplinary option according to MNPD's "Disciplinary/Corrective Action Grid Chart": "Dismissal."

The ALJ and the Commission voiced concerns about the zero-tolerance nature of this provision, especially in light of other provisions in section 2.10.100 of the MNPD Policy that allow for rehabilitation and participation in a department-approved, supervised drug and/or alcohol rehabilitation and treatment program. However, those provisions pertaining to rehabilitation are only applicable to employees who misuse prescription drugs or abuse alcohol, neither of which are in play in Officer Terrazas's situation.[6]

---

[6] Section 2.10.100(B)(2)(c) of the MNPD Policy states in pertinent part, "Rehabilitation program participation will be allowed only for the misuse of prescription drugs or the abuse of alcohol. THERE WILL BE NO ALLOWANCE FOR THE USE OF ILLEGAL DRUGS; those persons will not be afforded an opportunity to participate in a department-approved, supervised drug and/or alcohol rehabilitation and treatment program." (Emphasis in original.)

The stated purpose of section 2.10.100(B), the provision cited by the Commission as having been violated by Officer Terrazas, is to hold police officers responsible for what they put in their bodies. Elaborating on the reasoning for the harsh disciplinary result of dismissal, Deputy Chief Brian Johnson, who presided over Officer Terrazas's initial disciplinary hearing and sustained the substance abuse charge, testified as follows when asked why steroids like Boldenone are prohibited under the MNPD Policy:

> Well, steroids, I believe, in general, are known to cause sometimes mood disorders and things like that, so the police department has banned them. One, they're just -- on the face of them, they're illegal to take. And so with any illegal substance, you know, being police officers, we're bound to uphold the law, so we can't be in violation of the law by taking an illegal substance and then performing the job of a police officer.

Furthermore, Lieutenant Jerry Hertenstein testified that Boldenone is "specifically prohibited" by the MNPD Policy and that testing positive for it is a Category AA offense, which he explained is a "termination offense." Upon careful review, we discern no error in the Commission's decision that Officer Terrazas's positive drug test constituted a violation of section 2.10.100.

Although not raised by Officer Terrazas on appeal, to complete the analysis, we next consider the trial court's ruling that the discipline imposed by the Commission ignored the plain language of the MNPD's rules and regulations, rendering the decision to impose a suspension rather than termination arbitrary and capricious. "In its broadest sense, the [arbitrary and capricious] standard requires the court to determine whether the administrative agency has made a clear error in judgment." *Wade v. Tenn. Dep't of Fin. & Admin.*, 487 S.W.3d 123, 136 (Tenn. Ct. App. 2015) (quoting *Jackson Mobilphone Co., Inc. v. Tenn. Pub. Serv. Comm'n,* 876 S.W.2d 106, 110-11 (Tenn. Ct. App. 1993)). "An arbitrary decision is one that is not based on any course of reasoning or exercise of judgment or one that disregards the facts or circumstances of the case without some basis that would lead a reasonable person to reach the same conclusion." *Id.* (citations omitted).

As did the trial court, we find instructive the holding in *City of Memphis v. Civil Serv. Comm'n of City of Memphis* that "for a sensitive position such as that of a police officer, the City must be permitted to impose a zero-tolerance policy to combat substance abuse within the police force, without such a policy being undermined by the Commission." No. 02A01-9512-CH-00289, 1997 WL 685006, at *6 (Tenn. Ct. App. Nov. 4, 1997). In that case, a Memphis police officer who struggled with alcoholism voluntarily entered into the city's Employee Assistance Program ("EAP"); he subsequently tested positive for cocaine and was terminated for the positive drug test and for failing to comply with regulations by violating his EAP contract to remain drug free. *Id.* at *1-2. The Civil Service Commission of Memphis found that the police officer had

- 13 -

committed a violation worthy of discipline but rejected termination as being too harsh for a first offense under the circumstances. *Id.* at *4. The trial court reversed that decision, finding that the Commission had rendered a decision that was arbitrary and capricious. *Id.* at *6. On appeal, this Court affirmed the trial court's decision, concluding that "the City had a reasonable basis for termination" because "the Plan signed by [the officer] [was] stark in its clarity: 'Failure to remain substance free will result in termination of employment.'" *Id.*

The MNPD Policy, on which Lieutenant Hertenstein testified that Officer Terrazas would have been trained, is similarly stark in its clarity: a positive drug test merits the Category AA disciplinary action of dismissal. The Commission's action in this case signaled that it agreed that Officer Terrazas had violated section 2.10.100 of the MNPD Policy by testing positive for an illegal steroid but that it disagreed that the violation merited the dismissal that is provided in the policy. The Commission's decision disregarded the plain language of section 2.10.100 and its consequences for a positive test result.

We are sympathetic to the significant injuries Officer Terrazas received in the line of duty and the difficulties he endured in rehabilitating his body, and we are also mindful of Officer Terrazas's otherwise stellar disciplinary record. However, the Commission cannot be permitted to undermine the MNPD policy combating substance abuse within the police department. We therefore conclude that the trial court was correct in determining that the Commission rendered an arbitrary and capricious decision by substituting its judgment for the rules and policies of the MNPD.

## V. Conclusion

For the foregoing reasons, we affirm the judgment of the trial court in all respects. We remand this case to the trial court for enforcement of the judgment and collection of costs below. Costs on appeal are taxed to the appellant, David Terrazas.

_____
THOMAS R. FRIERSON, II, JUDGE

- 14 -