
IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
November 16, 2016 Session

## STEVEN YEN v. UNIVERSITY OF TENNESSEE KNOXVILLE

**Direct Appeal from the Chancery Court for Davidson County**
**No. 15-506-III      Ellen H. Lyle, Chancellor**

_____

### No. M2016-00875-COA-R3-CV

_____

This is an appeal of the University of Tennessee at Knoxville's termination of a tenured faculty member. After the University terminated Appellant, he appealed the validity of his termination to an administrative hearing officer pursuant to the Tennessee Uniform Administrative Procedures Act. Following a contested hearing, the hearing officer upheld the University's termination of Appellant. Appellant then petitioned the chancery court to reverse the decision of the hearing officer. The chancery court held that there was substantial and material evidence in the record to support the hearing officer's decision to affirm the termination of Appellant's employment and tenure. Discerning no reversible error, we affirm the judgment of the chancery court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed
and Remanded**

BRANDON O. GIBSON, J., delivered the opinion of the court, in which D. MICHAEL SWINEY, C.J., and J. STEVEN STAFFORD, P.J., W.S., joined.

Jerrold Lance Becker and Emily Kathryn Stulce, Knoxville, Tennessee, for the appellant, Steven Yen.

Frank Hilton Lancaster, Knoxville, Tennessee, for the appellee, University of Tennessee Knoxville.

### OPINION

### I. FACTS & PROCEDURAL HISTORY

Appellant, Dr. Steven Yen ("Dr. Yen"), was born and raised in Taiwan, where he studied English for seven years. Dr. Yen then immigrated to the United States in 1980 and has been a citizen of the United States since 1997. Prior to his employment with the

University of Tennessee at Knoxville (the "University"), Dr. Yen held faculty positions at multiple reputable institutions across the country.[1]  Dr. Yen was hired by the University in 2002 as an associate professor of agricultural economics and became a full professor at the University in 2011.  Dr. Yen is a prolific author with an impressive curriculum vitae, publishing more than 100 refereed journal articles, several book chapters and research reports, and making over 110 presentations at conferences.  Dr. Yen's employment as a tenured professor with the University continued until September 16, 2013.

The history of this case includes a lengthy cast of characters within the ranks of the University's administration, so a brief overview of those involved is necessary.  Dr. Yen's direct supervisor at the University was Dr. Delton Gerloff, who served as the Department Head of the Department of Agricultural and Resource Economics.  Because Dr. Yen's position at the University split his workload between research and teaching, he was also under the authority of both Dean William Brown (Dean for Research), and Dean Caula Beyl (Dean of the College of Agricultural Sciences and Natural Resources, who oversees teaching).  Dean Brown and Dean Beyl both report directly to Dr. Larry Arrington, who is the Chancellor for the University's Institute of Agriculture.  Two of Dr. Yen's closest friends and colleagues at the University were Dr. John Riley and Dr. Harwood Schaffer.

In April 2012, Dr. Yen received his performance review for the 2011 academic year (the "2011 Review"), which rated his performance as "Needs Improvement."  Some of the reasons given for this evaluation were Dr. Yen's deficiencies in receiving grants and his struggle to maintain collegiality with his co-workers, including his "tendency to challenge and demean colleagues' work and ideas."  The narrative portion of the 2011 Review was written by Dr. Yen's supervisor, Dr. Gerloff.  After receiving his performance review, Dr. Yen met with Dr. Gerloff to discuss the evaluation.  Dr. Yen then appealed his 2011 Review to Dean Brown and Dean Beyl, who denied the appeal in July 2012.

Shortly after the appeal of his 2011 Review was denied, Dr. Yen expressed that he was having suicidal ideations to his friend and colleague, Dr. Schaffer, stating: "One day you are going to come in and find me hanging from that door up there."  Dr. Schaffer was concerned and reported Dr. Yen's statement about hanging himself to Dr. Gerloff, who then contacted the department's human resources office.  Thereafter, some of Dr. Yen's colleagues decided to intervene and encouraged Dr. Yen to seek medical attention for his apparent depression.  This support group for Dr. Yen included Dr. Schaffer, Dr. Riley, and Julie Goldman, an administrative assistant in the department.  Dr. Yen heeded the

---

[1]Dr. Yen was a member of the faculty at the University of Alaska, Fairbanks, Nicholls State University, Iowa State University, the University of Illinois at Urbana-Champaign, Western Carolina University, and the University of Nevada, Reno.

advice of the group and obtained professional help from a psychiatrist, Dr. Arun Jethanandani, and a therapist, Mr. Colvin Idol. During his initial session with Dr. Jethanandani on July 14, 2012, Dr. Yen admitted once again to suicidal ideations and expressed homicidal ideations as well. Dr. Yen stated that he "felt mistreated" by the University and that "it upsets me so much that I think about hanging myself or them." Later that month, on July 27, 2012, Dr. Yen sent an email to Dr. Riley with a link to a story about a man who was seeing a psychiatrist but had nonetheless shot and killed several people at a movie theater in Aurora, Colorado. In the body of his email, Dr. Yen wrote to Dr. Riley that the story was "something I could relate [to], which was a little scary." Between 2012 and 2013, Dr. Yen's support group began to fracture due to a disagreement between Dr. Riley and Dr. Schaffer, which resulted in Dr. Yen refusing to speak to Dr. Schaffer.

In 2013, Dr. Yen was again evaluated by Dr. Gerloff, this time for the 2012 academic year (the "2012 Review"), and he received a rating of "Meets Expectations". This was an improvement over Dr. Yen's 2011 Review, but Dr. Yen was dissatisfied with the evaluation and once again appealed to Dean Brown and Dean Beyl. On Wednesday, September 4, 2013, Dr. Yen received a letter from Dean Brown and Dean Beyl denying the appeal of his 2012 Review. Later that day, Dr. Yen went to Dr. Riley's office and spoke with him there.[2] Julie Goldman testified that within a day or two of Dr. Yen's meeting with Dr. Riley, Dr. Riley came to her and he was "shaking like a leaf." Dr. Riley told Ms. Goldman that he was "very worried about Dr. Yen," and that Dr. Yen had made statements to him to the effect that he was going to "get a gun and kill these guys," and that he was going to "get an axe and chop them down the middle." Ms. Goldman, who had been a member of Dr. Yen's support group, stated that this statement by Dr. Yen "was far more graphic than the normal conversation from someone that was frustrated."

On Friday, September 6, 2013, Ms. Goldman told Dr. Gerloff that she was afraid that Dr. Yen might "go postal." Dr. Gerloff testified that he assumed that Ms. Goldman meant that Dr. Yen might injure someone in the department. Dr. Schaffer also discussed Dr. Yen's statements with Dr. Gerloff. On that same day, Dr. Gerloff reported Dr. Yen's alleged statements to Dean Brown. Dean Brown then spoke with Dr. Riley and Dr. Schaffer about the substance and context of Dr. Yen's statements. Dean Brown also contacted Chancellor Arrington regarding Dr. Yen's statements, and the two agreed that Dr. Yen should be placed on paid administrative leave.

The following Monday, September 9, 2013, Dean Brown and Dean Beyl met with Dr. Yen to place him on paid administrative leave, specifically informing Dr. Yen in

---

[2]Dr. Riley died on or about September 16, 2013. Therefore, all testimony at depositions and hearings in this matter regarding what was said by Dr. Yen to Dr. Riley in his office was offered through others who spoke with Dr. Riley regarding the event.

3

writing that:

> University officials will be reviewing reports that you made threatening statements including threats of physical violence in the workplace. Please be assured that while the University takes seriously any potential threat, UTPD [University of Tennessee Police Department] and other officials will also take your statement, and will review any information you may choose to offer related to these possible threats.

The same day, UTPD officials met with Dr. Yen to discuss the threatening statements he was alleged to have made to Dr. Riley, specifically that he supposedly said: "Maybe I should go get a gun, maybe I should shoot them, or maybe I should get an axe and I'll chop them right through the middle." This information had been reported to UTPD by Dr. Riley, who said that the previous week Dr. Yen had been "livid" and said: "I'm going to get a gun and kill these guys. I'm going to get an axe and chop them down the middle." However, Dr. Riley subsequently sent emails to Dean Beyl stating that he did not believe anyone was in danger and that Dr. Riley had made similar statements over the years and had not resulted to violence.

Throughout the week of September 9, 2013, while Dr. Yen was on paid administrative leave, the University and UTPD continued to investigate the matter. On September 11, 2013, Dr. Yen spoke with Dr. Gerloff by telephone and attempted to plead his case, stating that "he did not make any public threats," but that he was simply venting to Dr. Riley in the privacy of his office. In his notes from September 12, 2013, Dr. Gerloff wrote that there were "concerns among faculty and staff that there is an element of risk with [Dr. Yen] coming on campus and harming people," and that Dr. Gerloff did believe that to be a real possibility. Later in the week, Chancellor Arrington spent approximately three hours in a meeting with Dr. Gerloff, Dean Brown, Dean Beyl, Mary Lucal of the University's human resources department, UTPD Chief Troy Lane, and University Assistant General Counsel Lela Young, wherein he interviewed individuals about Dr. Yen's statements, and the group debated whether or not termination of Dr. Yen's employment was appropriate. As a result of this meeting, Chancellor Arrington determined that Dr. Yen's statements violated the University's Code of Conduct, which states that using "threatening language" is misconduct constituting adequate cause for termination of a tenured faculty member's employment. Chancellor Arrington further decided that it was appropriate to pursue the "expedited termination procedure" set forth in the University's Faculty Handbook, which provides for an accelerated process to terminate a faculty member when there is "alleged misconduct involving . . . credible threats of harm to a person." Chancellor Arrington then met with the University System President and the Faculty Senate President who both supported his decision to pursue the expedited termination of Dr. Yen.

4

## Pre-Termination (*Loudermill*) Hearing and Termination

On Monday, September 16, 2013, Dr. Yen met with Chancellor Arrington, Dean Brown, and UTPD Chief Lane in a UTPD conference room. This meeting was filmed, and the videotape of the meeting was later admitted into evidence at Dr. Yen's contested hearing. At the beginning of the meeting, Chancellor Arrington informed Dr. Yen that the purpose of the meeting was to advise him of the charges against him and give him an opportunity to respond to them. To that end, Chancellor Arrington gave Dr. Yen written and oral notice of the following charges:

> According to various reports, you made threatening statements quoted below, or substantially similar to the statements quoted below:
> - That you were so angry [you] wanted to "take a hatchet to [Dr. Gerloff] and others['] heads and watch them split open (with hand motions)."
> - ["]I'm going to get an axe and chop them down the middle."
> - ["]I'm going to get a gun and kill these guys."

Chancellor Arrington then asked Dr. Yen if he had anything to say that might refute these charges. Dr. Yen spoke for approximately thirty minutes in an attempt to defend himself, wavering back and forth about whether he actually made the statements at all, and that if he did make them, what he may have meant. Dr. Yen ultimately admitted to saying that he was going to chop someone down the middle with an axe, but he insisted that this statement was being taken out of context and that the miscommunication was due to his misunderstanding of idiomatic speech in the English language.

At the end of this meeting, Chancellor Arrington told Dr. Yen that nothing he heard that day made him believe that Dr. Yen did not make the threats he was alleged to have made. Chancellor Arrington then told Dr. Yen that it was with a heavy heart that he was going to have to terminate him but that he had to consider the safety of those around him. At the end of the meeting, Chancellor Arrington gave Dr. Yen a second letter notifying him that his employment was being terminated immediately for making credible threats of harm to University employees, which constituted adequate cause for termination of his tenure and employment.

## Post-Termination (TUAPA) Hearing

On September 19, 2013, Dr. Yen requested a hearing to contest his termination pursuant to the Tennessee Uniform Administrative Procedures Act ("TUAPA"), which

5

was authorized by the University's Faculty Handbook (the "post-termination hearing"). The post-termination hearing was held over the course of two days, June 11 and July 9, 2014, at the University. Jennifer Richter ("Hearing Officer") was designated to preside over the contested hearing. Both the University and Dr. Yen were represented by counsel. In addition to members of the University's faculty and administration, Dr. Yen and several of his mental health professionals testified at the post-termination hearing.

After taking the matter under advisement, on January 22, 2015, the Hearing Officer issued a 29-page Initial Order, consisting of 77 Findings of Fact and a thorough analysis of her Conclusions of Law. The Initial Order stated:

> After weighing and evaluating all of the evidence presented for the hearing of this matter, I conclude that the University met its burden of proof. As I explain below, I find that Dr. Yen used threatening language and by using such threatening language violated the Faculty Handbook and the University's Code of Conduct for its employees.

In support of this conclusion, the Hearing Officer found the following, as summarized below:

- Dr. Yen did make the threats he was alleged to have made as set forth in Chancellor Arrington's letter dated September 16, 2013.

- These threats were credible, although whether they were credible or not only mattered for purposes of determining whether an expedited termination process could be used as opposed to the standard termination process.

- Dr. Yen's denial of making these statements was not credible. Dr. Yen's own mental health professionals confirmed that Dr. Yen had mentioned chopping Dr. Gerloff's head in two.

- Dr. Yen's excuse that this was all a misunderstanding resulting from his misunderstanding of the English language was not credible. He was a very prolific writer in the English language and spent much of his life in various institutions of higher education where English was spoken. It was not believable that Dr. Yen did not understand the implications of the language choices he made with these statements.

6

- Dr. Yen himself agreed that it was common sense that if a university employee made statements about shooting coworkers or chopping them with an axe, it would constitute "threatening language" in violation of the University's Code of Conduct.

- The threatening language was taken seriously by those around Dr. Yen. Dr. Riley was "shaking like a leaf" while reporting the threats, and Dr. Gerloff felt so threatened that he increased police presence on the University's agriculture campus and installed a security system at his own home.

- Dr. Yen's history of suicidal and homicidal ideations further supported the credibility of the threats.

- Dr. Yen's mental health professionals were not dispositive of any determinations in the case.

- The University properly followed its own procedures in terminating Dr. Yen. The University's Code of Conduct specifically states that using threatening language may lead to disciplinary action, up to and including, termination. Dr. Yen's violation of the Code of Conduct by using threatening language was adequate cause for terminating a tenured professor's employment.

- The University was further permitted to proceed under its expedited procedure for terminating Dr. Yen pursuant to Section 3.12.3 of the Faculty Handbook because he engaged in misconduct involving "credible threats of harm to a person."

- The University then complied with the requirements of the expedited termination procedure prior to terminating Dr. Yen, which included giving him written notice of the charges against him and a basis for the charges, an explanation of the evidence against him, and an informal opportunity to refute the charges.

In sum, the Hearing Officer determined that the "situation involving Dr. Yen was serious and it was treated seriously. . . . For all of these reasons provided above, I find and conclude that the University had adequate cause, and applied the proper procedures, to terminate Dr. Yen's employment for misconduct." The Hearing Officer's Initial Order became a Final Order on February 26, 2015.

## Appeal to Chancery Court

On April 22, 2015, Dr. Yen filed a petition for judicial review of the Hearing Officer's Final Order. In his petition, Dr. Yen requested that the chancery court reverse the Hearing Officer's decision to uphold the termination of his tenure and employment because the Hearing Officer erred in the following ways:

1.  Failure to find that due process was not afforded to Dr. Yen in the expedited termination proceedings undertaken by the University of Tennessee;

2.  Failure to properly consider all of the evidence before the Hearing Officer regarding Dr. Yen's mental health in determining that she did "not find the information provided by the mental health professionals to be dispositive of any of the determinations to be made for this case";

3.  Failure to find that the University of Tennessee did not prove by a preponderance of the evidence that the alleged statements made by Dr. Yen to Dr. John Riley were sufficient to constitute a "credible threat" warranting expedited termination;

4.  Unconscionable delay in issuing the Initial Order [in violation of] Tenn. Code Ann. section 4-5-314(g) [and] Dr. Yen's due process rights;

5.  [Issuing a] Final Order [that] is defective [because] it does not comport with the requirements of Tenn. Code Ann. section 4-5-314.

These issues are essentially the same issues presently before this Court on appeal.

Both parties submitted briefs arguing their side of the case to the chancellor, and oral argument was held in chancery court on March 3, 2016. In addition to hearing the arguments of counsel, the chancery court also reviewed the transcript of the post-termination hearing and the exhibits entered therein and studied the decision of the

8

Hearing Officer as well as the applicable law. On April 6, 2016, the chancery court issued a Memorandum and Order Affirming Final Order Terminating Tenured Employment of Petitioner (the "Chancery Court Order"). The Chancery Court Order set forth many of the facts presented in the Initial Order, stating that it had confirmed those facts in its reading of the record. The Chancery Court Order then correctly articulated the standard of review applicable to this case, which we outline in Section III below.

The Chancery Court Order then set forth the court's analysis for rejecting Dr. Yen's assertions that the Hearing Officer committed any reversible error. Regarding Dr. Yen's issues before the chancery court numbered (2) and (3) above, which pertained to the sufficiency of the evidence before the Hearing Officer, the chancery court determined that Dr. Yen's arguments "require the Court to invade credibility determinations made by the Hearing Officer and to reweigh the evidence. This [ ] Court is not authorized to do [that] under the applicable standard of review." The chancery court found that the "record amply demonstrates evidence to support the Hearing Officer's decision and rationale." Turning to Dr. Yen's ground number (1) for reversal, which challenged the validity of the University's expedited termination procedure, the chancery court was satisfied that the University's procedure and the implementation of that procedure in this case satisfied due process. Finally, the chancellor decided that Dr. Yen's grounds numbered (4) and (5), which related to the timing and substance of the Hearing Officer's Initial Order, were not grounds for reversal. The chancellor therefore ordered that Dr. Yen's petition for judicial review be dismissed. Dr. Yen timely appealed that determination to this Court.

## II. ISSUES PRESENTED

Dr. Yen presents the following issues for review on appeal, which we have restated:

1. Whether the chancery court erred in affirming the Hearing Officer's decision that the University did not violate Dr. Yen's right to due process in their expedited termination of his tenure and employment?

2. Whether the chancery court was arbitrary and capricious and abused her discretion in affirming the Hearing Officer's finding that Dr. Yen's mental health was "not dispositive of any of the determinations to be made for this case"?

3. Whether the chancery court erred in affirming that the Hearing Officer did not err when she found that the University proved by a preponderance of the evidence that Dr. Yen's alleged statements to

Dr. Riley constituted a "credible threat" warranting expedited termination, and by failing to consider the context in which Dr. Yen initially made the statements at issue?

4. Whether the chancery court erred by failing to find that the Hearing Officer exceeded the statutory time limits to render her opinion, and whether such delay was unconscionable further violating Dr. Yen's due process rights?

5. Whether the chancery court erred in finding that the Hearing Officer's final order was not defective for failing to comply with the requirements of Tennessee Code Annotated section 4-5-314?

## III. STANDARD OF REVIEW

The process for judicial review of an agency decision begins in chancery court in accordance with the Tennessee Uniform Administrative Procedures Act. *See* Tenn. Code Ann. § 4-5-322(b)(1)(A). When an administrative agency is acting within its area of specialized knowledge, experience, and expertise, a trial court's review of the agency's decision "is governed by the narrow standard contained in Tennessee Code Annotated section 4-5-322(h) rather than the broad standard of review used in other civil appeals." *Publix Super Mkts., Inc. v. Tenn. Dep't of Labor & Workforce Dev.*, 402 S.W.3d 218, 222 (Tenn. Ct. App. 2012) (citing *Willamette Indus., Inc. v. Tenn. Assessment Appeals Comm'n*, 11 S.W.3d 142, 147 (Tenn. Ct. App. 1999)). Tennessee Code Annotated section 4-5-322(h) sets forth the following standard for courts reviewing an agency's decision:

The court may affirm the decision of the agency or remand the case for further proceedings. The court may reverse or modify the decision if the rights of the petitioner have been prejudiced because the administrative findings, inferences, conclusions, or decisions are:

(1) In violation of constitutional or statutory provisions;

(2) In excess of the statutory authority of the agency;

(3) Made upon unlawful procedure;

(4) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion; or

10

(5)(A) Unsupported by evidence that is both substantial and material in light of the entire record.

(B) In determining the substantiality of evidence, the court shall take into account whatever in the record fairly detracts from its weight, but the court shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact.

Tenn. Code Ann. § 4-5-322(h). Furthermore, "[n]o agency decision pursuant to a hearing in a contested case shall be reversed, remanded or modified by the reviewing court unless for errors that affect the merits of such decision." Tenn. Code Ann. § 4-5-322(i).

An aggrieved party may then appeal the decision of the chancery court to this Court pursuant to Tennessee Code Annotated section 4-5-323:

(a) An aggrieved party may obtain a review of any final judgment of the chancery court under this chapter by appeal to the court of appeals of Tennessee.

(b) The record certified to the chancery court and the record in the chancery court shall constitute the record in an appeal . . . .

(c) The procedure on appeal shall be governed by the Tennessee Rules of Appellate Procedure.

Tenn. Code Ann. § 4-5-323. When this Court is evaluating a trial court's review of an agency's decision, we must determine "whether or not the trial court properly applied the . . . standard of review found at Tennessee Code Annotated section 4-5-322(h)." *Wade v. Tenn. Dep't of Fin. & Admin.*, 487 S.W.3d 123, 126-27 (Tenn. Ct. App. 2015) (*citing Jones v. Bureau of TennCare*, 94 S.W.3d 495, 501 (Tenn. Ct. App. 2002)).

## IV. DISCUSSION

### A. Termination Proceedings

Dr. Yen makes numerous arguments contending that the University violated his right to due process while terminating his employment and tenure with the University. It is important to note, however, that all of Dr. Yen's due process complaints relate to his pre-termination hearing rather than to the full adversarial post-termination hearing held by the Hearing Officer pursuant to the TUAPA. It is undisputed that, as a tenured faculty member at a public university, Dr. Yen was entitled to due process before being

terminated.[3]  The issue presented by Dr. Yen on appeal concerns what kind of process was due.

In his brief on appeal, Dr. Yen appears to confuse the process to which he was entitled at his pre-termination hearing with the process required by due process at his post-termination hearing.  In *Cleveland Board of Education v. Loudermill*, 470, U.S. 532, 542 (1985), the Supreme Court explained that procedural due process requires "some kind of a hearing" *before* deprivation of the interest, which in this case is the termination of Dr. Yen's employment.  *Loudermill*, 470 U.S. at 542.  The pre-termination hearing entitled Dr. Yen to (1) oral or written notice of the charges against him, (2) an explanation of the University's evidence, and (3) an opportunity to present his side of the story.  *See Loudermill*, 470 U.S. at 542.  As in this case, when there is an elaborate post-termination hearing process available to the employee, the pre-termination hearing, "though necessary, need not be elaborate." *Id.* at 545.  In contrast with a post-termination hearing, which is a full, adversarial hearing, a pre-termination hearing is a much less arduous task designed to be an "initial check against mistaken decisions." *Duchesne v. Williams*, 849 F.2d 1004, 1007 (6th Cir. 1988) (*en banc*) (quoting *Loudermill*, 470 U.S. 545-46).

According to Dr. Yen, his due process rights were violated because the University's pre-termination hearing was illusory in that Chancellor Arrington and University officials had already made up their minds to terminate Dr. Yen before his pre-termination hearing.  In *Duchesne v. Williams*, the 6th Circuit held that "a pre-deprivation proceeding need not be a full evidentiary hearing with witnesses and a neutral decision maker." *Duchesne,* 849 F.2d at 1005 (quoting *Garraghty v. Jordan,* 830 F.2d 1295, 1302 (4th Cir. 1987)).  Practically speaking, if the University was not already leaning towards terminating Dr. Yen, the University would not have had a reason to call the pre-termination hearing in the first place.  Moreover, Dr. Yen was given approximately 30 minutes at the pre-termination hearing to respond to the notice of charges against him.  Ultimately, Chancellor Arrington decided that Dr. Yen had not given him any reason to believe he did not make the threats he was alleged to have made.  Dr. Yen's assertion that his due process rights have been violated because the decision to terminate him had been

---

[3]"Procedural due process imposes constraints on governmental decisions which deprive individuals of 'liberty' or 'property' interests within the meaning of the Due Process Clause of the . . . Fourteenth Amendment." *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976).  When a university faculty member shows a "legitimate claim of entitlement" to job tenure, he shows a "property interest" that "would obligate college officials to grant a hearing at his request, where he could be informed of the grounds for his nonretention and challenge their sufficiency." *Perry v. Sindermann*, 408 U.S. 593, 603 (1972).  By the same token, employment termination causing serious injury to an individual's reputation can deprive the person of a "liberty interest" and entitle him to notice and an opportunity to be heard to refute the charges. *Ludwig v. Bd. of Trustees of Ferris State Univ.*, 123 F.3d 404, 410 (6th Cir. 1997).

12

made prior to the meeting on September 16, 2014 is not availing.

Dr. Yen also attacks the validity of his pre-termination hearing on the grounds that he was "blindsided" by the fact that the meeting was a meeting for expedited termination and that the evidence against him was not properly explained to him. However, the record does not support Dr. Yen's contention that he was "blindsided," and we do not agree that due process required more notice than Dr. Yen was given regarding the meeting. The letter that Dr. Yen received putting him on administrative leave specifically stated that "officials will be reviewing reports that you made threatening statements including threats of physical violence in the workplace." On that same day, UTPD officials met with Dr. Yen and informed him of the specific allegations made against him. Furthermore, at the beginning of the pre-termination hearing, Chancellor Arrington gave Dr. Yen notice of the charges against him, an explanation of the charges against him, and an opportunity to respond to them. Dr. Yen then responded to these allegations for approximately half an hour. This is precisely the due process to which Dr. Yen was entitled at his pre-termination hearing.

As we have outlined above, a pre-termination hearing "need not be elaborate," and due process entitled Dr. Yen to oral or written notice of the charges against him, an explanation of the University's evidence, and an opportunity to present his side of the story. *See Loudermill*, 470 U.S. at 542. We agree with the chancery court that these requirements were satisfied and that Dr. Yen was provided with adequate due process when the University terminated his employment and tenure.

## B. **Determination Regarding Dr. Yen's Mental Health**

Dr. Yen next argues that the chancellor erred in finding that the Hearing Officer "amply demonstrated evidence to support [her] decision and rationale" for "disregard[ing]" the mental health evidence presented by Dr. Yen. As a preliminary matter, we note that the appellate brief submitted on behalf of Dr. Yen in this case is marked by a misstatement and/or misunderstanding of the applicability of the "substantial and material evidence" standard of proof. Many of the arguments presented by Dr. Yen, including those related to the issue of Dr. Yen's mental health, contain assertions such as: "The record contains substantial and material evidence *which supports an opposite conclusion* of that reached by the Hearing Officer . . . ." However, even if we found that to be true, the fact that the record contains evidence that could support a different decision by the Hearing Officer is not the standard for judicial review articulated by the TUAPA. *See* Tenn. Code Ann. § 4-5-322(h)(5)(A) (providing that a court may reverse the decision of a hearing officer if it is *not supported* by substantial and material evidence). It is not enough for Dr. Yen to show that the facts could support a different conclusion. *See Davis v. Shelby Cnty. Sheriff's Dep't*, 278 S.W.3d 256, 265 (Tenn.

2009).

The mental health professionals proffered by Dr. Yen included Dr. James Murray, Dr. Jethanandani, and Mr. Colvin Idol. Dr. Murray is a licensed clinical psychologist who practices forensic psychology. Dr. Murray administered a variety of tests on Dr. Yen after the statements at issue were made and concluded that Dr. Yen's threats were not credible. Regarding Dr. Murray's testimony, the Hearing Officer made the following findings:

> Dr. Murray testified that he administered the Minnesota Multiphasic Personality Inventory Test (the MMPI-2-RF). The administration of this test took place 8 months after the incidents of September 2013. . . . Dr. Murray testified that the MMP[I]-2-RF is a well standardized, well validated [test], used universally in a vast majority of forensic evaluations that involve personality assessment in civil and criminal cases.

> Dr. Murray testified that the results of the scores of the personality inventory could have been different had it been administered in September 2013.

Dr. Yen's treating psychiatrist, Dr. Jethanandani, did not conduct specific tests on Dr. Yen, but rather testified that based on her meetings with Dr. Yen she did not believe that he would actually follow through with the threats he made. Mr. Idol, Dr. Yen's treating therapist, did not perform any testing of Dr. Yen or testify as an expert, but Mr. Idol did state that during his treatment of Dr. Yen, he did not feel that Dr. Yen was a threat to himself or others. The Hearing Officer made the following conclusion regarding the testimony presented by Dr. Yen's mental health professionals:

> Dr. Yen's mental health professionals were helpful in relating their experiences with Dr. Yen; however, one was not part of his support system at the time of the events, and even the others could only look at the events afterwards and only through the eyes of Dr. Yen. I do not find the information provided by the mental health professionals to be dispositive of any of the determinations to be made for this case.

"Expert testimony is not ordinarily conclusive, but is purely advisory." *England v. Burns Stone Co.*, 874 S.W.2d 32, 38 (Tenn. Ct. App. 1993) (citing *Gibson v. Ferguson*, 562 S.W.2d 188 (Tenn. 1976)). As such, a trier of fact is free to "place whatever weight it chooses upon such testimony," including disregarding the expert testimony "if it finds that it is inconsistent with the facts or otherwise unreasonable." *Id.* A trial court's review of an agency's decision involves a determination of whether there is evidence in the

14

record to support the administrative decision.  Tenn. Code Ann. § 4-5-322(h).  The trial court does not substitute its own judgment for that of the agency regarding questions of fact.  Tenn. Code Ann. § 4-5-322(h)(5)(A) and (B).  The Hearing Officer specifically found Dr. Yen's threats to be "credible," despite the testimony of his mental health professionals.  As the trier of fact, the Hearing Officer was free to do so.

Furthermore, consideration of Dr. Yen's mental health is not a requirement for the termination of a faculty member pursuant to the section of the Code of Conduct Dr. Yen was accused of violating, *i.e.,* using threatening language.  At most, Dr. Yen's arguments related to his mental health speak to whether or not his threats were credible, which is only relevant to whether the University can use an expedited termination process or must follow their standard termination procedure.  When reviewing the Hearing Officer's order regarding this issue, the chancery court stated that Dr. Yen was essentially asking the court to re-weigh the evidence, which is not permissible under the standard of review set forth in Tennessee Code Annotated section 4-5-322(h).  We agree with the chancery court and discern no error in the Hearing Officer's decision to not rely on the opinions proffered by Dr. Yen's medical professionals.

## C. <u>Credibility of Threats</u>

Dr. Yen also contends that the Hearing Officer erred in finding that the University proved by a preponderance of the evidence that Dr. Yen's alleged statements to Dr. Riley constituted a "credible threat" warranting expedited termination and by failing to consider the context in which Dr. Yen initially made the statements at issue.  The Hearing Officer made specific findings that Dr. Yen's statements to Dr. Riley constituted "credible" threats.  In support of this determination, the Hearing Officer found that those around Dr. Yen took the threats seriously, Dr. Yen's history of suicidal and homicidal ideations supported the credibility of these threats, and that Dr. Yen's assertions that the whole situation was simply a cultural misunderstanding was not believable.  Moreover, the Hearing Officer correctly determined that whether the threats were credible or not only mattered for purposes of determining whether an expedited termination process could be used as opposed to the standard termination process.

We conclude that there is substantial and material evidence in the record to support the Hearing Officer's determination that Dr. Yen's threats were "credible" threats. Moreover, the determination of whether the threats were credible or not is not a conclusion affecting the merits of the Hearing Officer's judgment, and it is therefore not grounds for reversal under the standard for judicial review articulated in Tennessee Code Annotated section 4-5-322(i).

15

**D.  Timing of Hearing Officer's Initial Order**

Dr. Yen asserts that the chancery court erred in failing to find that the Hearing Officer committed reversible error by exceeding the statutory time limits set forth in Tennessee Code Annotated section 4-5-314(g) in rendering her opinion for the Initial Order.  According to Dr. Yen, this "unconscionable delay" violated his due process rights, and he was prejudiced as a result.  Tennessee Code Annotated section 4-5-314(g) provides, in pertinent part, that an "initial order . . . shall be rendered in writing within ninety (90) days after conclusion of the hearing or after submission of proposed findings . . . unless such period is waived or extended with the consent of all parties or for good cause shown."  Tenn. Code Ann. § 4-5-314(g); *see also* Tenn. Code Ann. § 4-5-314(f) (stating that a "hearing officer may allow the parties a designated amount of time after conclusion of the hearing for the submission of proposed findings").

The contested hearing of this case concluded on July 9, 2014.  The Hearing Officer thereafter instructed counsel for both parties to submit proposed findings of fact and conclusions of law on or before August 15, 2014.  Both parties complied with this request, and the period for the Hearing Officer to render her Initial Order began when Dr. Yen submitted his proposed findings on August 15.  Ninety days from August 15, 2014 ran on November 13, 2014.  With no decision forthcoming, on January 14, 2015, counsel for the University and Dr. Yen reached out by email to the Hearing Officer to inquire as to the status of the Initial Order.  The Hearing Officer responded that same day and said that she would be sending out her decision the next week.  The following week, on January 23, 2015, the Hearing Officer emailed her Initial Order to counsel for both the University and Dr. Yen.

It is undisputed that the Hearing Officer's Initial Order was rendered after the 90 day time period set forth in Tennessee Code Annotated section 4-5-314(g).  However, this Court has held that the 90 day requirement for rendering an Initial Order is "directory rather than mandatory" and that a hearing officer's failure to comply with that time requirement does not automatically nullify the hearing officer's decision, particularly in the absence of prejudice to the complaining party.  *See Daley v. Univ. of Tenn. at Memphis*, 880 S.W.2d 693, 694 (Tenn. Ct. App. 1994).  Further, the TUAPA specifically states that "[n]o agency decision pursuant to a hearing in a contested case shall be reversed, remanded or modified by the reviewing court unless for errors that affect the merits of such decision."  Tenn. Code Ann. § 4-5-322(i).

Dr. Yen also raised the Hearing Officer's failure to comply with the 90 day requirement for rendering her decision as an issue in the chancery court proceedings. The chancellor noted the legal principle set forth above, that the time requirement is directory rather than mandatory, and also found the following from its review of the

record:

> [T]he Hearing Officer's decision was comprehensive and thorough. The time the Hearing Officer took to cite to the record and painstakingly sift through and weigh the evidence and then explain that process demonstrated care and deliberation. The Hearing Officer's decision also enabled this Court to do its work on judicial review and promptly issue a decision. The time it took the Hearing Officer to issue her decision is not grounds for reversal.

On appeal, Dr. Yen argues that he was prejudiced by the Hearing Officer's delay in a variety of ways, including that it inhibited his ability to gain future employment, but we do not find evidence to support those assertions in the record of this case. We therefore affirm the chancellor's decision that the delay in rendering the Initial Order is not reversible error.

## E. **Contents of the Hearing Officer's Orders**

Finally, Dr. Yen contends that the chancellor erred in failing to find that the Initial Order was defective because it did not contain statements within the body of the order itself regarding the procedures and time limits for seeking reconsideration and the process by which the Initial Order would become a Final Order.[4] Tennessee Code Annotated section 4-5-314(c) states that the following information must be included in a hearing officer's order:

> The final order, initial order or decision must also include a statement of the available procedures and time limits for seeking reconsideration or other administrative relief and the time limits for seeking judicial review of a final order. An initial order or decision shall include a statement of any circumstances under which the initial order or decision may, without further notice, become a final order.

Tenn. Code Ann. § 4-5-314(c).

---

[4]Neither party sought reconsideration or review of the Initial Order, and the acting Agency Head, Dr. High, did not review the Initial Order on her own initiative. The Initial Order therefore became the Final Order by operation of law on February 27, 2015. *See* Tenn. Code Ann. § 4-5-314(b) (providing that "an initial order . . . shall become a final order unless reviewed in accordance with § 4-5-315") and Tenn. Code Ann. § 4-5-315 (requiring a motion for reconsideration or review to be filed "within fifteen (15) days after entry of the initial order"). Due to this sequence of events, the Initial Order and the Final Order are one in the same. For that reason, Dr. Yen asserts that they are both deficient for failing to include the required information set forth in Tennessee Code Annotated section 4-5-314(c).

Just as with the 90 day requirement for rendering opinions, Dr. Yen again asserts a technical deficiency with the Hearing Officer's Initial Order without showing any legitimate prejudice to him and without citing any law for the proposition that this is reversible error. Tennessee Code Annotated section 4-5-322(h) states that a reviewing court may reverse an agency's decision "if the rights of the petitioner have been prejudiced." Tenn. Code Ann. § 4-5-322(h). Notably, Dr. Yen did meet the deadline for filing a notice of appeal. Dr. Yen contends that the prejudice he endured as a result of this error was that he "had to look to multiple sources in order to receive adequate notice regarding the available procedures and time limits" for appeal of the Hearing Officer's decision.

On October 31, 2013, Katherine High, serving as the Agency Head for the University, sent a letter to Jennifer Richter appointing her to be the administrative judge (Hearing Officer) for Dr. Yen's contested hearing. Counsel for Dr. Yen was copied on this letter. The letter discussed the process by which the Hearing Officer's Initial Order would become a Final Order by operation of law, the rights of both parties to seek reconsideration of the Initial Order and/or the Final Order, and the right to seek judicial review of the Final order by filing a petition for review with the chancery court. On February 10, 2015, Dr. Yen's counsel was copied on an email from the University's attorney to the Agency Head, Katherine High, which attached a copy of the Hearing Officer's Initial Order to allow her to decide whether she would review the Initial Order on her own initiative. The body of this email detailed the procedures for reconsideration and judicial review of the Initial Order and the regulatory and statutory authority for these procedures. On March 3, 2015, counsel for Dr. Yen was again copied on an email, which was from the University's attorney to Katherine High, stating that the time for the Agency Head to review the Initial Order had passed making it a Final Order, and setting forth the time frame in which Dr. Yen could seek judicial review of the Final Order. Dr. Yen thereafter timely filed his petition for judicial review on April 22, 2015.

On judicial review, the chancery court examined the case of *Thomas v. Commissioner of Safety*, No. 01-A-01-9011-CH-00412, 1991 WL 111428 at \*4, (Tenn. Ct. App. June 26, 1991), in which this Court held that a typewritten appendix attached to an initial order titled "Notice of Appeal Procedures" and containing one section pertinent to "review of [the] initial order" and another regarding "review of the final order," was sufficient although it was not part of the actual text of the final order. In the case at hand, the chancellor found that Dr. Yen "received proper notice through the letter dated October 31, 2013, from the Agency Head's appointment of the administrative judge; the February 10, 2015 letter to the Petitioner from the University; and the notice the Petitioner received on March 3, 2015 from the University." We agree with the decision of the chancery court that Dr. Yen was properly advised of his rights to review and appeal in this matter. Further, Dr. Yen's contention that he has been prejudiced because

he had to look to multiple sources in order to ascertain his rights to appeal falls within the category of errors not affecting the merits of the decision in this case and is therefore not reversible error pursuant to Tennessee Code Annotated section 4-5-322(i).

## IV. CONCLUSION

For the foregoing reasons, we affirm the judgment of the chancery court. Costs of this appeal are taxed to the appellant, Steven Yen, and his surety, for which execution may issue if necessary.

_____
BRANDON O. GIBSON, JUDGE